NOTICE

Decision filed 08/05/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230340-U

NO. 5-23-0340

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Piatt County. |
| | ) | |
| v. | ) | No. 21-CF-70 |
| | ) | |
| JEROME H. SCHMIDT, | ) | Honorable |
| | ) | Dana C. Rhoades, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice McHaney and Justice Moore* concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State presented sufficient evidence to support the defendant's first degree murder conviction. The defendant has not established an ineffective assistance of counsel claim. The circuit court did not err in sentencing the defendant as it considered defendant's youth and attendant circumstances and the sentencing decision was not an abuse of discretion.

¶ 2    After a bench trial, the defendant, Jerome H. Schmidt, was found guilty of first degree murder. He was sentenced to 50 years in the Illinois Department of Corrections (IDOC) and 3 years' mandatory supervised release (MSR). The defendant argues, on appeal, that the State failed to prove his guilt beyond a reasonable doubt, defense counsel provided ineffective representation,

_____

*Justice Welch participated in oral argument. Justice Moore was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

and the sentence, imposed on the juvenile offender, was an unconstitutional *de facto* life sentence. We affirm the judgment and sentencing decision of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4     On the evening of January 25, 2021, and the morning of January 26, 2021, the defendant, along with his half-brother, Blayton Cota, and another juvenile, L.F., drove through multiple small towns near Springfield, Illinois, and broke into a series of cars and garages. At approximately 3 a.m. on January 26, 2021, the three individuals arrived in Hammond, Illinois. Masked and wearing gloves, the trio entered a detached garage owned by Michael Brown and his wife, Linda Brown. The garage had motion activated security cameras. Mrs. Brown received a notification, viewed footage of intruders attempting to enter their garage, and then informed her husband. Mr. Brown grabbed his firearm and went into his garage to confront the trespassers. During the confrontation, Mr. Brown fired one shot, and the defendant shot Mr. Brown multiple times. Mr. Brown did not survive the confrontation.

¶ 5     The defendant, Cota, and L.F. fled after the shooting, disposed of evidence, and did not report the incident. On September 30, 2021, after an investigation linked the defendant to the death of Mr. Brown, the defendant was charged by information with first degree murder (720 ILCS 5/9-1(a)(3) (West 2020)) while committing the forcible felony of burglary (720 ILCS 5/19-1(a) (West 2020)).

¶ 6                                    A. Pretrial Motions

¶ 7     The State filed two motions *in limine* to admit evidence of other bad acts of the defendant. The State, in its first motion, sought to present evidence that the defendant had stolen a Ford F-150 truck. The State asserted that at some point in time during the evening of January 25, 2021, or during the morning of January 26, 2021, the truck was stolen from a garage in Lovington, Illinois,

approximately eight miles from Mr. Brown's residence. In the second motion, the State sought to introduce evidence that on January 25, 2021, the defendant had stolen two firearms from an unlocked vehicle parked in a driveway in Cantrall, Illinois. The State argued that the stolen firearms were inextricably linked to the burglary of the Brown's garage and Mr. Brown's murder, as one of the firearms was the murder weapon. The defense objected and argued it was extremely prejudicial to inform the jury that the defendant had been involved with stealing a truck and guns.

¶ 8      The circuit court took the matter under advisement and subsequently entered a written order granting both motions, allowing the State to enter evidence of the stolen vehicle and the murder weapon. The State, however, was not allowed to introduce evidence of the second stolen firearm that had no connection with the charged offense.

¶ 9      Defense counsel additionally filed a motion to allow counsel to provide discovery to the defendant. The defendant had also filed a *pro se* request for discovery. The circuit court entered an order allowing defense counsel to provide discovery to the defendant to review.

¶ 10                                    B. Trial

¶ 11      On January 9, 2023, after the selection of the jury commenced, the defendant waived his right to a jury trial and proceeded with a bench trial. The State presented its opening statement, and the defendant reserved his opening statement.

¶ 12      The State called Linda Brown as its first witness. Mrs. Brown testified that she was at home with her husband, Michael Brown, on the evening of January 25, 2021. Mrs. Brown explained that they had multiple motion activated security cameras installed on the outside of their property, which recorded video and audio. If the security cameras detected movement, Mrs. Brown would receive a notification on her iPad. Mrs. Brown awoke in the middle of the night, between 2:45 a.m. and 3 a.m. on January 26, 2021, and she noticed an alert on her iPad of movement near their shed.

3

Mrs. Brown reviewed the surveillance camera video footage and saw three people were on their property. She watched as they attempted to access the shed, but the door was locked. She then observed the individuals peer into the detached garage through a window on the south side. The surveillance video was entered into evidence.

¶ 13 Mrs. Brown testified that she woke Mr. Brown after watching the people breaking into their garage. Mr. Brown put on his glasses and hearing aids, grabbed his Glock, and went outside. Mrs. Brown then glanced outside from their patio door and returned to the bedroom when she did not see anyone. By the time Mrs. Brown reached her bedroom, she heard multiple gunshots that sounded as if they were fired from two different firearms. Mrs. Brown described the first gunshots as "rapid fire multiple shots." Then she heard two louder gunshots, which sounded like gunshots from Mr. Brown's gun. Mrs. Brown looked out of her window towards the back door of the garage, and she saw two people leaving the garage.

¶ 14 Mrs. Brown ran to the garage and could hear Mr. Brown moaning before she could reach him. He called for help as Mrs. Brown dialed 911. Mr. Brown then said that he was dying and that he could not breathe. Mrs. Brown testified that there were too many multiple gunshot wounds to apply any pressure to stop the bleeding. She stayed with Mr. Brown until he passed away. The police arrived thereafter.

¶ 15 On cross-examination, Mrs. Brown testified that she was able to tell the difference between a .45-caliber round and a 9-millimeter round by sound. She believed that Mr. Brown had fired his .45-caliber pistol twice and two bullets from his firearm were found in the garage.

¶ 16 Michael Butler, Mr. and Mrs. Brown's next door neighbor, testified that on January 26, 2021, he was awakened by a loud noise that "sounded like a door possibly." Butler looked out of his bedroom window and also from the front of the house. After he did not see anything, he

returned to bed. He then heard four or five shots fired in a rapid cadence. Butler looked again and saw two people running through his yard.

¶ 17 Another neighbor, Tony Overlin, testified that he was not at home during the incident, but had video cameras installed on his property. Overlin's video footage was shown. The sound of one gun shot, followed by a second gunshot, and then another pause before several gunshots were fired was heard on the recording.

¶ 18 The parties then stipulated that Mr. Brown was 64 years old on January 26, 2021, and that the Piatt County Coroner pronounced Mr. Brown dead at 4:10 a.m. that morning. An autopsy was performed by Scott Denton, and the parties stipulated that he opined that Mr. Brown's death was caused by multiple gunshot wounds, which included gunshots to his left upper arm, right upper abdomen, left lower abdomen, left lower back, right wrist, right mid-arm, and the right side of his back. The wound track of the gunshot to Mr. Brown's left upper arm was upwards, while the wound tracks of the gunshots to his abdomen, and left lower back were downward.

¶ 19 L.F., a juvenile friend of the defendant's, testified that he was with the defendant and Blayton Cota on January 25, 2021, and January 26, 2021. According to L.F., the defendant had tricked L.F. into believing that they were going to go to a party. Instead, the defendant drove L.F. and Cota out of town and handed L.F. a ski mask and gloves. They proceeded to rummage through cars and garages. That evening, they had stolen a truck from someone's garage, and they drove the truck to the area where Mr. Brown lived.

¶ 20 L.F. testified that he entered Mr. Brown's garage with the defendant and Cota. L.F. was instructed to find the light switch while the defendant and Cota attempted to break into a safe. Mr. Brown then walked into the garage, turned the lights on, shut and locked the door, cocked his gun, and said "who's in my garage."

5

¶ 21    L.F. had crouched down and crawled under a truck, as the defendant and Cota kneeled down at gunpoint in front of Mr. Brown. The defendant then told Mr. Brown a story that he needed money for his sister's cancer treatment. L.F. then came out from under the truck and put his hands up and Mr. Brown turned towards him. While Mr. Brown was distracted by L.F., Cota ran. Mr. Brown then turned towards Cota, and L.F. ran towards the door that Mr. Brown had entered through. L.F. then heard two gunshots and temporarily froze, while Cota kept running. L.F. then continued to run towards the door.

¶ 22    L.F. testified that he turned around when he reached the door and saw the defendant hiding behind a wall in the garage. Mr. Brown had been shot and was sitting on the ground. The defendant then came out from behind the wall, pointed his gun down, and fired into Mr. Brown. The defendant then ran past L.F. and told him that they had to leave, and L.F. followed. The three ran back to the stolen truck and drove it back to Springfield, Illinois.

¶ 23    On the drive, the defendant called his mother and during the call, he said "mom I f*** up, I f*** up, he shot at B, I had to, I just killed a guy." L.F. testified that they drove to the defendant's grandfather's house. After they arrived, L.F. changed, and the defendant washed their clothes.

¶ 24    L.F. additionally testified that he had been charged with murder and in exchange for his testimony, the murder charge would be dismissed. He also agreed to plead guilty to residential burglary. L.F. also testified that he had initially told the police officers that he ran from the garage first, and then later corrected himself. L.F. also testified that the defendant had not fired the first shot.

¶ 25    After the conclusion of L.F.'s testimony, a stipulation regarding the testimony of Drake Nelson was read into the record. Nelson lived in Lovington, Illinois and was the owner of a Ford F-150 truck. On January 25, 2021, Nelson parked his truck inside of his garage and left his key in

6

the console. The following morning, Nelson discovered that his garage door was open; the garage door was off track; and Nelson's truck was missing. He called 911 and reported his truck as stolen.

¶ 26    A stipulation of the testimony of Chance Warnisher, a police officer with the Springfield Police Department was also read into the record. Warnisher responded to a call that a truck had been abandoned in a wooded area. The license plate matched the truck that Nelson reported stolen.

¶ 27    Jerrod Day testified that he had been married to the defendant's mother, but they divorced in October of 2021. Day was incarcerated for unlawful possession of a weapon by a felon and aggravated fleeing and eluding a police officer. Day testified that he did not like the defendant, and he had not received any offers in exchange for his testimony.

¶ 28    On January 26, 2021, Day had received a call from Jessica Cota, the defendant's mother, and she was "hysterical." Day drove to the defendant's grandfather's house after speaking with Jessica. Day then picked up the defendant and L.F. During their drive, the defendant said, "is it weird that I don't feel bad." Day explained that he was not aware of what had occurred when he dropped off the defendant and L.F. In July of 2021, Day informed the police of the incident, after he realized what had happened.

¶ 29    Eric Greenlee, a violent crimes investigator from the Illinois State Police, testified that he had prepared search warrants for this case and obtained cell tower records. For a few months after the incident, law enforcement did not have any long term suspects. After receiving records from AT&T, which referenced phone numbers in the area of Hammond during the early morning of January 26, 2021, law enforcement linked the defendant and L.F. to the area through their cell phone information.

¶ 30    On cross-examination, Greenlee testified that one .45 ACP cartridge was found in Mr. Brown's garage. Greenlee was familiar with the security video footage from the night of the

7

incident. He recalled in the video obtained from Overlin that he could hear one shot being fired, followed by a pause and then repeated gunshots. Greenlee believed that Mr. Brown had fired his gun first.

¶ 31 A stipulation of testimony of Christopher Amero, a resident of Cantrall, Illinois, approximately 10 miles north of Springfield, Illinois, was read into the record. Amero reported a residential burglary on January 25, 2021, and his truck, which was parked on his driveway, had been rummaged through. Amero kept a loaded Sig Sauer Model P226 9-millimeter firearm in the back seat of his truck, and the firearm was missing.

¶ 32 Another stipulation of testimony of John Ryan, a resident of Sangamon County, Illinois, was also read into the record. On April 5, 2021, Ryan was fishing in the Sangamon River in Petersburg, Illinois. Ryan discovered pieces of a semi-automatic handgun on the riverbank and placed those pieces in a plastic bag. Ryan called 911 and gave the plastic bag of firearm pieces to Michael Nichols, the assistant police chief for the City of Petersburg.

¶ 33 Michael Nichols then testified that he recovered the pieces of the Sig Sauer handgun. The gun had been "field stripped," where the firearm had been disassembled. The upper portion had been separated from the lower portion, and there was a magazine. The serial number was intact and matched the firearm reported stolen by Amero.

¶ 34 Hali Carls-Miller was employed by the Illinois State Police at the Springfield Forensic Science Laboratory as a forensic scientist in the firearms section. She was qualified as an expert witness in the field of firearms analysis and identification. Carls-Miller testified that she had analyzed over 20 pieces of evidence in this case, including the fired casing and fragments collected from Mr. Brown's garage. She determined that 14 casings had come from the slide of the 9-millimeter pistol and identified 9 pieces of fired bullet evidence as being fired from the 9-

8

millimeter pistol. She also identified one fired cartridge case from a Glock. Carls-Miller was unable to match any fragments to the Glock. There were also 13 fragments that were unsuitable for comparison.

¶ 35 After the State rested, the defense presented its opening statement. The defense then called the defendant's mother, Jessica Cota, as their first witness. Jessica testified that she received a phone call at approximately 3 a.m. on the morning of January 26, 2021. The defendant was "frantic, crying, screaming," and she was not able to understand the defendant at first. The defendant told Jessica that a man had held the defendant, L.F., and Cota at gunpoint while they were on their knees. Cota tried to run away, and the man shot at him. The defendant told Jessica that he was begging for his life, and that he did not have a choice, so the defendant shot the man. The defendant had also asked the man to call the police, and he had refused.

¶ 36 The defendant testified, on his own behalf, that he was 17 years old on January 26, 2021, when he was "hittin' cars" with L.F. and Cota. He explained that they would drive to a town and check the door handles of parked cars to see whether they were unlocked. If a car was unlocked, then they would search for money.

¶ 37 The defendant testified that they had traveled to Hammond, Illinois, that morning and entered the Brown's property. The defendant admitted that he had tried to access an outdoor shed, but the door was locked. Then, they discovered that the garage was unlocked. Once inside of the garage, Cota began searching through cabinets and the lights were "flickering like they were motion sensored." L.F. was directed to find the fuse box to turn the lights off. Cota found boxes of ammunition and a gun safe. Cota's hands were full as he had a gun in one hand, and a flashlight in the other. He asked the defendant to hold his gun so he could look through the safe. Then they heard a dead bolt "lock or unlock."

9

¶ 38    The defendant testified that he thought that the police had arrived and was afraid that the police would shoot him because he had a gun. The defendant and Cota ran to a corner of the garage and the defendant put the gun under his left armpit. The defendant heard someone entering the garage and the sound of a gun being cocked. The lights turned on and the defendant "peeked" around the corner from where he was hiding to see Mr. Brown walking towards them with a firearm in his left hand and raised in the air.

¶ 39    According to the defendant's testimony, Mr. Brown then said, "what the f*** are you doing in my garage." The defendant responded, "sir, we're just kids, please don't shoot." Mr. Brown then said, "I don't give a f***, you came into the wrong f*** garage tonight." Mr. Brown continued to walk towards the defendant and Cota and told them get on their knees and raise their hands. The defendant testified that he put his hands in the air while using his elbow to push the gun against his rib cage. The defendant then told Mr. Brown that his mother had cancer, and he wanted money for cancer treatment. Mr. Brown responded, "I don't give a f***, um, put your hands in the air or I'll shoot you."

¶ 40    Then, L.F. made a noise that came from behind Mr. Brown's left shoulder. Mr. Brown apparently was not aware that there were three people in the garage. He directed L.F. to join the defendant and Cota on the ground. The defendant also told L.F. to join and as he did so, Cota ran towards the door. Mr. Brown then fired at Cota. The defendant testified that "I just seen my brother go down, and when he had went down he went out of my view um, because of that wall."

¶ 41    The defendant stated that Mr. Brown turned and aimed his gun in the defendant's direction, and the defendant feared for his life. The defendant in response, "pulled the gun out of [his] arm pit and shot." He did not know if the gun was cocked or ready to be fired, he "just pulled the trigger" in the direction of Mr. Brown. The defendant saw that Mr. Brown was "pushing himself

10

up against the wall and the gun was on the ground by his feet." The defendant then walked towards the exit and realized that Cota was not on the ground.

¶ 42   When the defendant reached the door, Cota was there. Cota asked the defendant if he was okay and the defendant was concerned that Cota had been shot. Cota told the defendant that he slid and the bullet went past his head. The defendant was crying, and Cota had to tell the defendant to "calm down and breathe." Cota grabbed the firearm from the defendant and told L.F. to hurry. The defendant, Cota, and L.F. then ran for the truck.

¶ 43   The defendant testified that Cota had "buckled over and started to puke" on their way to the truck. The defendant was still concerned that Cota may have been shot and checked Cota for blood. When the defendant and Cota reached the truck, L.F. was sitting in the backseat. Cota sat in the passenger seat, and the defendant took the driver's seat. The defendant testified, "I told my brother that we needed to wait for the cops to get there and to see what was going to happen, and he told me I was trippin'." L.F. also wanted to leave.

¶ 44   The defendant then called his mother, Jessica, while he was crying and breathing heavily. During the call, the defendant explained that a man had shot at Cota and that the defendant "had to do it" and he was "sorry." The defendant also had asked his mother for advice on whether they should call the police because he thought they should wait for the police, but Cota disagreed.

¶ 45   On cross-examination, the defendant admitted that they had stolen cars and had stolen the truck in Lovington, Illinois, that they were driving at the time of the incident with Mr. Brown. The defendant testified that Mr. Brown had only fired once, and the remaining shots were fired by the defendant. The defendant explained that he was on his knees and behind a wall when he first shot at Mr. Brown and as he was standing up, he continued to fire his gun. He denied standing over Mr. Brown and shooting him multiple times.

11

¶ 46 Cota was called to testify after the defendant, and Cota invoked his fifth amendment right against self-incrimination. The parties stipulated that a recorded two and half hour interview of Cota taken while he was at the Piatt County Sheriff's Office was an accurate recording of the interview. The parties agreed that the video was allowed under a hearsay exception. An agreed upon time-stamped portion of Cota's interview was admitted into evidence and presented. During this portion of Cota's interview, Cota explained that as he was near the exit of the garage, he heard seven or eight gunshots. Cota was afraid that his brother was dead because they both had guns. Then, the defense rested.

¶ 47 Mrs. Brown was recalled by the State as a rebuttal witness and testified that Mr. Brown was not left-handed and did not hold his firearm in his left hand. Mrs. Brown had been to a shooting range with Mr. Brown and had watched him fire a gun. Mrs. Brown also testified that while Mr. Brown was in their bedroom on January 26, 2021, he had picked up his gun and "put his clip in and then chambered a round." The State did not present additional rebuttal witnesses after Mrs. Brown testified.

¶ 48 The parties presented closing arguments. The State argued that the defendant had confessed to burglary and murder, and the evidence presented supported a conviction of first degree murder. The defense argued that the defendant was acting in self-defense and in the defense of others where the defendant had feared for his life and the life of his brother. The defense then argued that a second degree murder conviction should be considered where there was serious provocation or an unreasonable belief in the need for self-defense. Mr. Brown's discharge of his firearm in the direction of Cota demonstrated a serious provocation that caused the defendant to shoot and kill Mr. Brown. The State then argued in rebuttal that self-defense was not available to the defendant

12

who had committed a forcible felony, and burglary was a forcible felony. The circuit court adjourned the proceedings after closing arguments.

¶ 49    On January 17, 2023, the circuit court delivered its decision. The circuit court considered the defendant's claim of self-defense and that conflicting testimony had been presented. The circuit court specifically addressed the evidence presented as to where everyone was standing in the garage and determined that Cota had to advance towards Mr. Brown to reach the exit. The circuit court also considered L.F.'s testimony that the defendant pointed his gun down at Mr. Brown, who was in a seated position, and fired at Mr. Brown. Mr. Brown also had three gunshot wounds to his back. This evidence contradicted the defendant's testimony that Mr. Brown had turned around to face the defendant after firing at Cota.

¶ 50    The circuit court found that a loaded 9-millimeter pistol was sufficient to demonstrate that the defendant had planned to use force to escape. The undisputed fact that the defendant had tucked the firearm under his armpit established that he had not surrendered nor had he withdrawn from the forcible felony. The defendant had also distracted Mr. Brown by telling L.F. to come out from where he was hiding, as Brown turned his attention away from the defendant. Ultimately, Mr. Brown did not have control of the situation, and it was reasonable for Mr. Brown to believe that all three individuals in his garage were armed. Mr. Brown had not used unlawful force against the defendant, Cota, or L.F. Furthermore, the evidence did not demonstrate that the three individuals had made an overt act or an overt withdrawal from the commission of the forcible felony that would have restored Mr. Brown's sense of security.

¶ 51    The circuit court found that the defendant was not entitled to the defense of self-defense. The State had proven that the defendant was guilty of first degree murder.

13

¶ 52    The defendant filed a posttrial motion on January 25, 2023, and argued that the circuit court erred by denying the defendant's self-defense claim where the defendant claimed he had withdrawn from the commission of a burglary. The posttrial motion also alleged that the circuit court erred by finding that the defendant had not sufficiently withdrawn from the burglary to allow for the invocation of a self-defense claim. The defendant additionally argued that the State failed to prove the defendant guilty of first degree murder beyond a reasonable doubt. The circuit court denied the motion on February 23, 2023, prior to the sentencing hearing.

¶ 53                                   C. Sentencing

¶ 54    During the sentencing hearing, the parties agreed that the penalty range for first degree murder was a minimum of 20 years and a maximum of 60 years with an MSR of 3 years. The parties additionally agreed that the circuit court had discretion in imposing the 25-year sentencing enhancement for the discharge of a firearm, as the defendant was under the age of 18 at the time of the offense. Because the defendant was under the age of 21 at the time of the commission of the first degree murder, section 5-4.5-115 of the Unified Code of Corrections[1] applied. Therefore, the defendant would be eligible for parole review after serving at least 20 years of his sentence.

¶ 55    Jeremy Tracy, a correctional officer at the Piatt County jail, testified at the sentencing hearing that he was aware of several incidents involving the defendant. The defendant used another inmate's pin number to make phone calls; he kicked and pounded on a door after the correctional officers had not responded to a request; he pushed open a door that he was not allowed to access; he refused a pat down and became physical with correctional officers; and a sprinkler in the defendant's cell was damaged. Tracy testified that the defendant was "very defiant" and "reluctant to follow even the simplest of rules." Tracy additionally testified to an incident where the defendant

---

[1]730 ILCS 5/5-4.5-115 (West 2022).

acted appropriately by immediately returning a handcuff key discovered by the defendant in his laundry bag.

¶ 56    Michael Brown testified that he was a detective with the Springfield Police Department, and he was not related to the victim in this case. Detective Brown testified to the defendant's juvenile criminal history that began in 2015. When the defendant was 11 years old, he had already stolen air soft guns. Approximately 24 or 25 subsequent police reports involved the defendant. In March of 2020, the defendant wase investigated for numerous car burglaries in Springfield, Illinois. A loaded 9-millimeter firearm was discovered in the defendant's bedroom during the burglary investigation. The defendant had also broken into the Springfield Police Department's crime scene van and had stolen a camera. In December of 2020, the defendant had stolen firearms and vehicles and posted the stolen items for sale on his Snapchat account. The State did not present further evidence in aggravation after Detective Brown's testimony concluded.

¶ 57    The defendant then presented evidence in mitigation. The defendant's grandmother, Tammy Williams, testified that the defendant did not have a stable home environment; throughout his childhood, he alternated living with his mother, grandfather, and father. Williams believed that the defendant was a caring person who has had "a rough life." She also testified that the defendant had issues with sleeping and drinking after the death of Mr. Brown. This testimony concluded the defendant's evidence in mitigation.

¶ 58    Mrs. Brown then presented a victim impact statement. She stated that she had been married to Mr. Brown for 46 years, and that he was a father and grandfather. After the incident, Mrs. Brown began taking sleeping medication, and she continued to struggle with sleepless nights and nightmares. "Fireworks that sound like gun fire" triggered stress and she became afraid of the dark.

¶ 59     The State then argued factors in aggravation, including that the defendant had a history of prior delinquency; a substantial prison sentence was necessary to deter others from committing crimes; and the victim was over 60 years old. The State additionally argued factors that were unique to the defendant being a juvenile at the time of the offense. The defendant was 17 years old; he did not have any disabilities or delays. Evidence was presented that he was able to consider risk and consequences. For example, he knew that what he was doing was dangerous, which was why he had a gun. The State did not believe that the defendant had strong family support, and the State was unaware of whether the defendant was attending school. No evidence had been presented that demonstrated that the defendant was subjected to outside pressure or peer pressure. L.F. testified that the defendant made the decision of where to go that evening. The defendant had the opportunity to correct his behavior, and he had not changed his behavior. The defendant's participation in the crime was significant as he orchestrated the burglaries and was the shooter. The defendant was also involved in a significant amount of crime prior to this incident.

¶ 60     The State requested a sentence of 55 years in prison. The State sought a prison sentence at the higher end of the sentencing range and did not believe that it was necessary for the circuit court to apply a sentencing enhancement.

¶ 61     The defendant argued that his parents were absent during his childhood, and he never had the opportunity to learn right from wrong growing up. The presentence investigation report (PSI) included that the defendant was using drugs and drinking alcohol since he was 10 or 11 years old, and the defendant reported that he had been diagnosed with attention deficit hyperactivity disorder (ADHD) and bipolar disorder. The PSI additionally included that the defendant had a ninth-grade education. The defense argued that the defendant's older brother had also been involved in the

16

incident, and that the defendant did not intend to shoot anyone that day. The defense requested a 25-year sentence in the IDOC.

¶ 62    The defendant provided a statement in allocution, and he apologized to Mr. Brown's family and friends, to his own family, and to the court, and specifically apologized to Mrs. Brown. The defendant stated that he did not intend to shoot Mr. Brown and never intended to kill Mr. Brown. He stated that shooting Mr. Brown was "the worst thing I ever had to do, the worse split second decision I ever had to make," and that he was "dumb" and "negligent." He wished that he would have stayed at home that evening and that he had to live with his poor decisions.

¶ 63    The circuit court considered the victim impact statements, including statements that were submitted and not read during the hearing; witness testimony; arguments of counsel; the defendant's statement in allocution; the nature and character of the offense; the defendant's character and history; and the PSI. The circuit court considered factors in aggravation and mitigation and considered the nine additional mitigating factors for sentencing an individual under 18 pursuant to section 5-4.5-105  of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2022)).

¶ 64    The circuit court found that no evidence was presented regarding several of the mitigating factors under section 5-4.5-105. Specifically, no evidence was presented on whether the defendant had a cognitive or developmental delay, if he was subjected to outside pressure, or if the defendant had been subjected to abuse or neglect as a juvenile. The circuit court considered that the defendant had "bounced around" different homes during his childhood. The circuit court also considered that the defendant was 17 years old at the time of the offense, was the principal actor in this case, and had meaningfully participated in his defense. He was represented in court throughout the trial, he

17

testified, and an order had been entered to allow the defendant to review discovery while he was in custody.

¶ 65    The circuit court additionally considered the specific facts of the case, including that the defendant and the two other co-defendants had engaged in a pattern of burglary and thefts in numerous locations. They had all worn masks and gloves, and the defendant had a stolen firearm. The circuit court concluded that the facts demonstrated that the defendant had calculated the crime.

¶ 66    The circuit court reiterated that the defendant's claim of self-defense was not supported by the evidence where the defendant went into Mr. Brown's garage with the intention of stealing items and intentionally tucked a loaded firearm into his armpit with the intention of hiding the weapon and using it. The defendant had not contacted the police to claim self-defense. Rather, he discarded evidence. The circuit court additionally considered a stipulation from the forensic pathologist that Mr. Brown had been shot eight times and that Mr. Brown was on the ground when the defendant pointed the gun down to shoot Mr. Brown three additional times after Cota left the garage. The circuit court considered that the defendant was trying to "eliminate a witness" that would be able to identify him.

¶ 67    On February 23, 2023, the defendant was sentenced to 50 years of imprisonment in the IDOC with 3 years of MSR. The defendant subsequently filed a motion to reconsider his sentence on February 27, 2023, and argued that the 50-year sentence was excessive.

¶ 68    On May 1, 2023, the circuit court heard the motion to reconsider the defendant's sentence. The defendant stood on his written motion, as no further argument was made. The circuit court denied the defendant's motion to reconsider the sentence on May 1, 2023.

¶ 69    The defendant requested that a notice of appeal be prepared on his behalf. The notice of appeal was filed on May 4, 2023, and the defendant's conviction and sentence imposed were included.

¶ 70                                    II. ANALYSIS

¶ 71    On appeal, the defendant argues that the State failed to prove that the defendant was guilty beyond a reasonable doubt; defense counsel provided ineffective assistance of counsel; and the circuit erred by imposing an unconstitutional 50-year *de facto* life sentence.

¶ 72                          A. Sufficiency of the Evidence

¶ 73    The defendant was charged under a felony-murder theory where the State alleged that the defendant committed burglary (720 ILCS 5/19-1(a) (West 2020)), a forcible felony, and discharged a firearm which resulted in the death of Mr. Brown in violation of section 9-1(a)(3) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(3) (West 2020)). Felony murder requires proof of an intent to commit the underlying felony but does not require proof of an intent to kill. *People v. Avdic*, 2023 IL App (1st) 210848, ¶ 39.

¶ 74    Under the "proximate cause theory," a defendant is liable under the felony-murder rule for any death proximately resulting from the unlawful activity, even if the killing was caused by the person resisting the crime. *People v. Lowery*, 178 Ill. 2d 462, 465 (1997). "[F]orcible felonies are so inherently dangerous that a resulting homicide, even an accidental one, is strongly probable." *People v. Pugh*, 261 Ill. App. 3d 75, 77 (1994). Furthermore, it is reasonably foreseeable that death could occur if a criminal defendant encounters resistance during the commission of a forcible felony. *Givens v. City of Chicago*, 2023 IL 127837, ¶ 57. A death that occurs during the escape from a forcible felony, such as burglary, also falls within the scope of the felony-murder rule. *People v. Jones*, 2015 IL App (1st) 142597, ¶ 21.

19

¶ 75    However, an intervening cause, completely unrelated to the acts of the defendant, relieves the defendant of criminal responsibility for felony murder. See *People v. Domagala*, 2013 IL 113688, ¶ 39. For example, gross or intentional medical malpractice can be considered a valid defense when the intervening actions are abnormal and not reasonably foreseeable. *People v. Gulliford*, 86 Ill. App. 3d 237, 241 (1980).

¶ 76    "When presented with a challenge to the sufficiency of the evidence, this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Harden*, 2011 IL App (1st) 092309, ¶ 27. We will not retry the defendant when assessing his sufficiency of the evidence claim. *People v. Swenson*, 2020 IL 124688, ¶ 35. The trier of fact determines witness credibility, weighs witness testimony, and resolves conflicts and draws reasonable inferences from the evidence. *Swenson*, 2020 IL 124688, ¶ 36.

¶ 77    The defendant does not dispute that he was inside Mr. Brown's garage with L.F. and Cota with the intention of committing burglary (720 ILCS 5/19-1(a) (West 2020)). The defendant, however, argues that he had surrendered and was no longer committing the burglary when Mr. Brown used deadly force to prevent Cota from fleeing. The defendant further argues that Mr. Brown's decision to use deadly force against Cota after the commission of the burglary was the proximate cause of Mr. Brown's death.

¶ 78    The circuit court did not find the defendant's testimony credible and rejected the defendant's claim that he had surrendered to Mr. Brown. The circuit court considered Mr. Brown's actions and responses. L.F. had remained out of sight when Mr. Brown initially addressed the defendant and Cota. Cota had advanced towards Mr. Brown to reach the door after Mr. Brown realized L.F.'s presence. Mr. Brown would not have known whether Cota was attempting to attack

20

Mr. Brown or flee. Mr. Brown also had no knowledge of whether all three of the individuals that had broken into his garage were armed.

¶ 79   The defendant's actions did not demonstrate that he had surrendered and that the commission of the burglary had concluded when Mr. Brown fired his weapon. The defendant told Mr. Brown a story about his mother needing cancer treatment and had encouraged L.F. to come out from where he was hiding, which diverted Mr. Brown's attention away from the defendant. The defendant also remained armed and had tucked his weapon under his armpit to keep it hidden from Mr. Brown. The autopsy revealed that Mr. Brown had been shot in his back, which contradicted the defendant's testimony that Mr. Brown turned around and faced the defendant after shooting at Cota. L.F. additionally testified that the defendant had fired his gun several times into Mr. Brown after he had been shot and was on the ground. The autopsy additionally indicated a downward trajectory of some of the gunshot wounds into Mr. Brown, which supported L.F.'s testimony.

¶ 80   The evidence was sufficient to support the circuit court's findings and to sustain a conviction. The defendant fired his weapon and killed Mr. Brown as he made his escape and during the commission of a forcible felony. Any rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt based on the evidence presented in this case.

¶ 81                      B. Ineffective Assistance of Counsel

¶ 82   The defendant argues that defense counsel was ineffective for advancing a theory of self-defense and arguing that the defendant was guilty of second degree murder. By pursuing legally unavailable defenses, the defendant argues that defense counsel effectively conceded the

21

defendant's guilt. The defendant further argues that he was prevented from advancing the theory that his actions were not the proximate cause for Mr. Brown's death.

¶ 83    Criminal defendants have a constitutional right to effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15. Claims of ineffective assistance of counsel are governed by a two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to establish a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44. To establish deficient performance, the defendant must overcome the strong presumption that the challenged decision by defense counsel may have been the product of sound trial strategy. *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 42.

¶ 84    Both prongs of the *Strickland* test must be satisfied by the defendant for a finding of ineffectiveness. *People v. Veach*, 2017 IL 120649, ¶ 30. We apply *de novo* review to the defendant's ineffective assistance of counsel claims. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 91.

¶ 85    The Supreme Court recognized that "the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate,' " and that "[t]he right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984) (quoting *Anders v. California*, 386 U.S. 738, 743 (1967)). "Where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, there is a denial of Sixth Amendment rights that makes the adversarial process itself presumptively unreliable." *People v. Kozlowski*, 266 Ill. App. 3d 595, 600 (1994). In that circumstance, ineffective assistance of counsel can be established without determining prejudice. *Kozlowski*, 266

22

Ill. App. 3d at 600. "[A] defendant must still meet the *Strickland* test unless the case involves a complete failure to subject the State's case to meaningful adversarial testing." *People v. Nieves*, 192 Ill. 2d 487, 500 (2000).

¶ 86    "The choice of defense theory is ordinarily a matter of trial strategy, and counsel has the ultimate authority to decide this trial strategy." *People v. Guest*, 166 Ill. 2d 381, 394 (1995). Defense counsel is "not required to manufacture a defense where none exists." *People v. Lopez*, 242 Ill. App. 3d 160, 171 (1993). Furthermore, "[a] weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense." *People v. Ganus*, 148 Ill. 2d 466, 474 (1992).

¶ 87    Generally, criminal defendants cannot raise self-defense against a charge of felony murder. *People v. Rosenthal*, 394 Ill. App. 3d 499, 506 (2009). For self-defense to apply to a defendant who was committing or attempting to commit a forcible felony, there must be a complete withdrawal where the subsequent use of force initiates a new conflict. *People v. Mills*, 252 Ill. App. 3d 792, 799 (1993).

¶ 88    Second degree murder is committed when a person commits first degree murder and (1) acts under sudden and intense passion resulting from serious provocation or (2) acts under the belief that he needed to use deadly force to protect himself, but his belief was unreasonable. 720 ILCS 5/9-2(a)(1), (2) (West 2020). "The provocation defense of second degree murder is not available to a charge of felony murder" under the plain language of the statute. *People v. Morgan*, 197 Ill. 2d 404, 452 (2001).

¶ 89    The defendant testified on his own behalf and acknowledged that he shot Mr. Brown; he did not dispute that he also had the intention of committing a burglary. Defense counsel argued at trial that the defendant had surrendered and had completely withdrawn from the commission of

23

the burglary before Mr. Brown decided to use deadly force. Therefore, it was plausible that Mr. Brown had created a new conflict by firing at Cota and turning his gun towards the defendant, and that the defendant then used self-defense against Mr. Brown during this new conflict. The circuit court ultimately did not find the defendant's testimony credible and found that sufficient evidence demonstrated that the defendant had planned to, and did, use force to escape. Defense counsel, nevertheless, had advanced a viable claim of self-defense and subjected the State's case to meaningful adversarial testing.

¶ 90 Second degree murder, on the other hand, was not available to the charge of felony murder. *Morgan*, 197 Ill. 2d at 452. Conceding the defendant's guilt, however, does not constitute " '*per se* ineffectiveness whenever the defense attorney concedes his client's guilt to offenses in which there is overwhelming evidence of that guilt.' " *Guest*, 166 Ill. 2d at 395 (quoting *People v. Johnson*, 128 Ill. 2d 253, 269 (1989)).

¶ 91 The defendant argues that he was prevented from advancing a theory that his actions were not the proximate-cause of Mr. Brown's death. The defendant concedes that it may have been entirely foreseeable that an armed homeowner would confront a burglar in the act of burglarizing his detached garage. The defendant additionally argues that Mr. Brown's actions in shooting Cota as he fled were not foreseeable and would have resulted in criminal liability to Mr. Brown if Cota had been shot, and the defendant had not shot Mr. Brown.

¶ 92 The circuit court specifically considered whether Mr. Brown was justified in his actions. Mr. Brown initially was not aware of L.F.'s location in the garage when the defendant claimed that he had surrendered. The circuit court determined that L.F. had distracted Mr. Brown and Cota advanced towards Mr. Brown to reach the exit. Mr. Brown would not have known whether Cota had intended to attack or flee or whether the intruders were armed. Mr. Brown did not have control

24

of the situation when he discharged his firearm. Furthermore, the circuit court found that the defendant shot Mr. Brown in the back and had continued to fire into Mr. Brown after he had fallen to the ground. During the sentencing hearing, the circuit court additionally noted that the defendant's actions were likely made to "eliminate a witness."

¶ 93 As the circuit court rejected the defendant's version of events and the evidence against the defendant was overwhelming, the defendant would not have been successful had defense counsel pursued this defense. See *Nieves*, 192 Ill. 2d at 501. The defendant was not prejudiced by defense counsel's unviable argument that the defendant had at most committed second degree murder. The defendant has not demonstrated ineffective assistance of counsel.

¶ 94 The defendant raised an additional claim of ineffective assistance of counsel claiming that defense counsel was ineffective for stipulating to other crimes evidence. Defense counsel objected to two motions *in limine* filed by the State. The first motion sought to introduce evidence that the defendant had stolen a Ford F-150 and drove the stolen truck to Mr. Brown's residence. The second motion sought to introduce evidence that two firearms had been stolen the night before the incident and the Sig Sauer 9-millimeter pistol that was used to kill Mr. Brown was later recovered.

¶ 95 Defense counsel had argued against allowing the State to introduce the proposed evidence outlined in both motions as it would be prejudicial to the defendant. The circuit court, however, entered a written order allowing the State to introduce evidence regarding the theft of the Ford F-150 and the murder weapon, as they were directly connected to the offense. Defense counsel was successful in prohibiting the State from introducing evidence of the second stolen firearm.

¶ 96 "As a matter of trial strategy, defense counsel might choose to stipulate to evidence in an effort to minimize the adverse impact it will have at trial." *People v. Phillips*, 217 Ill. 2d 270, 284 (2005). Defense counsel's decision to stipulate to other crimes evidence was reasonable trial

strategy where the circuit court had allowed the State to present the evidence outlined in the stipulation. Therefore, the defendant has not established an ineffective assistance of counsel claim.

¶ 97                                          C. Sentencing

¶ 98    The eighth amendment prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. Inherent in the prohibition of cruel and unusual punishment is the concept of proportionality. *Graham v. Florida*, 560 U.S. 48, 59 (2010). A criminal sentence must be "graduated and proportioned to both the offender and the offense." *People v. Davis*, 2014 IL 115595, ¶ 18.

¶ 99    For sentencing purposes, juveniles are considered constitutionally different from adults. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). A sentence for a juvenile offender is unconstitutional where "(1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *People v. Buffer*, 2019 IL 122327, ¶ 27. *Miller* requires that, before imposing such a sentence, the circuit court must consider youth and its attendant circumstances. *Miller*, 567 U.S. at 483, 489. "[T]he *Miller* Court mandated 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." *Jones v. Mississippi*, 593 U.S. 98, 108 (2021).

¶ 100    Illinois has codified the *Miller* factors. See 730 ILCS 5/5-4.5-105(a) (West 2020). As such, before sentencing a juvenile defendant, a sentencing court must consider the following factors in mitigation:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

26

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2022).

¶ 101 The defendant relies on *Holman* and argues that the circuit court failed to determine whether the defendant's "conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46. However, *Holman* has been overruled. *People v. Wilson*, 2023 IL 127666, ¶ 42. Under *Wilson*, juveniles can be sentenced to life in prison without a separate finding of incorrigibility. *Wilson*, 2023 IL 127666, ¶ 42. Furthermore, "[u]nder *Jones* and Illinois law, as long as the trial court considers the factors set forth in section 5-4.5-105(a) in exercising its discretion, it may sentence a juvenile offender to a prison term greater than 40 years and not violate the eighth amendment." *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 32.

¶ 102 In this case, the circuit court addressed factors in aggravation and mitigation and specifically addressed the additional mitigation factors applicable to juvenile offenders as required under section 5-4.5-105(a) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2022)). Under those additional mitigating factors, the circuit court considered that the defendant was 17 years old when he committed the offense. No evidence demonstrated that he had any

cognitive or developmental delays. No evidence demonstrated that the defendant was subjected to outside pressure, rather, the defendant was the principal actor in the crime. The circuit court considered that the defendant's housing was unstable as a juvenile, but there was no evidence of abuse or neglect. The circuit court considered that no direct evidence was presented with respect to the defendant's potential for rehabilitation, other than the defendant's young age. The circuit court additionally had considered the PSI which indicated that the defendant had a ninth-grade education; he began abusing substances when he was 10 years old; and he had been diagnosed with ADHD and bipolar disorder.

¶ 103   The circuit court detailed the circumstances of the offense in its findings and rejected the defendant's claim of self-defense and determined that the defendant acted with calculation. The circuit court additionally considered that the defendant shot Mr. Brown multiple times after he was on the ground and seriously wounded. The circuit court considered this behavior as an effort to "eliminate a witness."

¶ 104   The defendant was able to meaningfully participate in his defense as a pretrial order was entered to allow the defendant to personally review discovery. The circuit court was also able to consider the defendant's appearance and demeanor in the courtroom during the trial. The defendant had a prior history of delinquency which included burglaries and stolen firearms. The circuit court additionally considered the defendant's statement in allocution.

¶ 105   A circuit court imposing a sentence within the statutory limits will only be deemed excessive and an abuse of discretion where the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). A circuit court has "broad discretionary powers in imposing a sentence,

28

and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 106   The circuit court considered defendant's youth and attendant circumstances and imposed a sentence within the applicable statutory sentencing limits. We find that the circuit court's sentencing decision was not an abuse of discretion.

¶ 107                                    III. CONCLUSION

¶ 108   For the foregoing reasons, we affirm the judgment of the circuit court of Piatt County.

¶ 109   Affirmed.